STERN TANNENBAUM & BELL LLP
David S. Tannenbaum
Rosemary Halligan
Jonathan Kotler
380 Lexington Avenue
New York, New York 10168
(212) 792-8484
*Attorneys for On The Move, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x
ON THE MOVE, INC.,

           Plaintiff,

   v.

TRUCKNOLOGY, INC., THE BRONX TRUCK
RENTAL CORP., TRUCK MAXX MOVING, INC. and
EUGENE GREENBAUM,

           Defendants.

: 08 Civ. 2533 (DAB) (JCF)

TRUCKNOLOGY, INC.

           Plaintiff,

   v.

ON THE MOVE, INC.,

           Defendant.

: 08 Civ. 6108 (DAB) (JCF)

**AFFIDAVIT OF SUSAN NASH
IN SUPPORT OR MOTION
FOR A DEFAULT JUDGMENT
AND TO DISMISS CLAIMS**

STATE OF TEXAS  )
         ) ss:
COUNTY OF KENDALL )

  SUSAN NASH being duly sworn, deposes and says as follows:

  1. I am President and Chief Executive Officer of plaintiff On The Move, Inc.

("OTM"), and I make this affidavit in support of OTM's motion upon personal knowledge for an

order: (1) entering a judgment of default, pursuant to Fed. R. Civ. P. 55(b), against defendants Trucknology, Inc. ("Trucknology"), The Bronx Truck Rental Corp. ("Bronx Truck"), Truck Maxx Moving Inc. ("Truck Maxx," or together with Trucknology and Bronx Truck, the "Corporate Defendants") and Eugene Greenbaum ("Greenbaum," or together with the Corporate Defendants, "Defendants") in the above captioned action, On The Move, Inc. v. Trucknology, Inc. and Greenbaum (08 Civ. 2533) (the "OTM Action")[1]; (2) dismissing Trucknology's claims that are asserted in the above captioned action, Trucknology, Inc. v. On the Move, Inc. (08 Civ. 6108) (the "Trucknology Action," with the OTM Action, the "Consolidated Actions"), with prejudice, for failure to prosecute pursuant to Fed. R. Civ. P. 41(b); and (3) awarding OTM such further and other relief as the Court may deem just and proper.

## Background

2.  OTM is a Texas corporation principally involved in offering a complete "turn key" truck rental program to its customers.

3.  OTM executed various Lease Agreements with Trucknology and Bronx Truck (the "Lease Agreements," or individually "Lease Agreement") from 2002 through 2006 pursuant to which Trucknology and Bronx Truck leased certain trucks from OTM. A copy of sample Lease Agreements with the respective Personal Guarantee (as defined herein) and other enclosures (the "Lease Agreement Package") is annexed hereto as Exhibit A.[2]

---

[1] For sake of clarity, I refer to "Defendants," although we recognize that the parties are in the opposite roles in each case.

[2] Copies of the Lease Agreements relevant to OTM's ex parte motion for an order of seizure were submitted to the Court at the time of making the motion. See Docket Number 8, Exhibit D-1 through D-24C5. I am further advised by counsel that, pursuant to the Court's rules, two sets of courtesy copies of OTM's ex parte motion were provided to the Court with all of the relevant Lease Agreement Packages appended thereto. Those Leases represent approximately 55 of the approximately 100 Leases at issue here. Since the Lease Agreement Packages are voluminous, and since all of them contain identical operative provisions, OTM annexes sample Lease Agreement Packages. Should the Court deem it

2

4. Each Schedule "A" to the Lease Agreements sets forth OTM's account number, a description of each Truck, each Truck's vehicle identification number ("VIN"), each truck's residual value (that is, the value after the end of the lease), the particular lease term, monthly lease payment amount and other details of the particular lease.

5. The Lease Agreements were executed each time Trucknology or Bronx Truck leased a truck or trucks.

6. Greenbaum, the principal of each of the Corporate Defendants, executed personal guarantees (the "Personal Guarantees") with respect to Trucknology and Bronx Truck's underlying obligations under each of the Lease Agreements.

7. Under the terms of the Lease Agreements, Trucknology and Bronx Truck were obligated to pay monthly lease payments to OTM, as well as maintain adequate insurance and pay registration fees and taxes, and any other operating expenses, as more particularly described in each Lease Agreement.

8. Trucknology and Bronx Truck also were licensees under OTM's master insurance policy and were obligated to make license payments to OTM for liability and third party property damage insurance.

9. Trucknology and Bronx Truck were also required to make license payments related to insurance for certain vehicles that had been under lease with OTM but the relevant lease had expired and Trucknology and Bronx Truck had purchased the vehicle. (Collectively, all the past due license payments for insurance are referred to hereafter as the "Insurance Program Payments.")

10. OTM was the insured party that was ultimately responsible for the paying the insurance premiums for the Trucks. Any Insurance Program Payments that OTM collected were

---

appropriate for OTM to submit all of the Lease Agreement Packages at issue, OTM will of course do so.

adjusted to include a nominal amount to offset OTM's administrative expenses and applied to the premium paid by OTM.

11. Paragraph 14 of the Lease Agreements provided Defendants the opportunity to terminate.

12. Paragraph 2 of the Schedule "A" to the Lease Agreements further provides that, "The Lessee shall be responsible for any difference between the stated residual value of the vehicle(s), as described above, and the actual value of the vehicle(s) at the end of the lease term."

13. As demonstrated in the relevant leases (Schedules "A"), the residual value of the vehicles was not de minimus but represented a meaningful amount of money. For example, the sample Schedules "A" attached hereto provided for a residual value of $10,929 and $6,550, respectively, and represent approximately 20% of the initial value of the trucks. (See Ex. A.)

14. The Lease Agreements did not require Defendants to use and lease the trucks until the residual value of each truck reached zero nor did they obligate Defendants to renew or otherwise purchase the trucks at the end of the lease term.

**Defendants' Breached the Lease Agreements and Personal Guarantees**

15. Despite proper repeated demand, beginning in or about November 2006, Trucknology and Bronx Truck failed to pay certain lease payments as required by the Lease Agreements and failed to make certain Insurance Program Payments. Similarly, despite proper repeated demand, Greenbaum failed to honor his obligations under the Personal Guarantees and cure the defaults.

16. As stated in the Amended Complaint (annexed hereto (without exhibits) as Exhibit B), past due and unpaid lease payments, as well as past due insurance program, license and residual ("LEV") payments, late fees and expected lease payments and expected LEV

4

payments total millions of dollars.

17. This failure to pay the agreed-upon lease payments and other related charges clearly constituted a material default of each of the Lease Agreements and the Personal Guarantees.

18. As a result of these defaults, OTM provided written notice to Defendants that it was terminating the Lease Agreements pursuant to section 13 of the Lease Agreements.

19. OTM subsequently moved for, and was granted, an ex parte order of seizure with respect to the trucks still in Defendants' possession, the majority of which were seized under the authority of the U.S. Marshall on April 25, 2008.

**Defendants Are Jointly and Severally Liable As Alter Egos**

20. As explained more fully in the accompanying memorandum of law, each of the Defendants should be held liable as alter egos for the full amount of expectation damages.

21. In this regard, I also annex a true and correct copy of the affidavit of Kirk Nash, sworn to June 4, 2009 (the "Kirk Affidavit") as Exhibit C. Mr. Nash was the President of OTM during the period the Lease Agreements were executed, and we obtained his affidavit during the course of these actions to ensure that his relevant testimony was memorialized

22. Upon information and belief, all of the Corporate Defendants are engaged in the same business, namely leasing trucks, share the same office address of 1144 Zerega Avenue, Bronx, New York, and directly or indirectly share the same principal -- Greenbaum. (see also Kirk Affidavit ¶ 6.)

23. Greenbaum frequently wrote checks bearing the name of one of the Corporate Defendants or another corporate entity which, upon information and belief, he controlled, to make payment on behalf of another of the Corporate Defendants. (See Exhibit D hereto.)

5

24.     Additionally, an Internet search for "Trucknology" and "Bronx Truck Rental" directs Internet users to the website for Truck Maxx and directs the user to contact Truck Maxx. (See Exhibit E hereto.)

25.     Furthermore, Defendants have defaulted in this action by, inter alia, failing to respond to OTM's discovery requests relating to whether the Corporate Defendants maintained the proper corporate form -- presumably in an effort to continue to frustrate OTM's claims and perpetuate Greenbaum's "shell game." See also Kirk Affidavit ¶ 7 (describing Greenbaum's admission to Mr. Nash that he had forced one of his companies into bankruptcy protection and simply formed a new company to assume the bankrupt company's operations).

### OTM Did Not Forge Greenbaum's Signature

26.     I am advised that Defendants' allege that OTM forged Greenbaum's signature on some of the Lease Agreements.

27.     This allegation is unequivocally false and, during the relevant time period, no one acting on behalf of OTM forged any signatures -- be they Greenbaum's or anyone else's.

28.     As importantly, any allegation of forgery simply makes no sense because Greenbaum and the Corporate Defendants readily accepted, and made at least certain lease payments on, the trucks leased under those Lease Agreements. (Copies of payment histories with respect to the purportedly forged Lease Agreements are annexed hereto as Exhibit F.)

29.     Plainly, OTM did not, and could not force Defendants to lease, use, and rent trucks to third parties if they did not desire to do so simply by forging Greenbaum's signature on the agreements.

30.     Similarly, Mr. Nash states unequivocally that neither he nor any employee or officer of OTM ever forged lease agreements. (Kirk Affidavit ¶¶ 9-10.)

31. Mr. Nash further reiterates that this allegation makes no sense since Greenbaum accepted the trucks at issue and made sporadic payments. (Kirk Affidavit ¶ 11; Ex. E hereto.)

32. Therefore, this allegation should be disregarded as nonsensical and utterly without merit.

### Greenbaum is Personally Liable to OTM

33. I am advised by counsel that Greenbaum alleges that he is not personally liable for the Corporate Defendants' breaches of the Lease Agreements because he executed the Personal Guarantees in his corporate capacity as follows: "Trucknology, Inc., a New York corporation by _____, its President, Guarantor."

34. As an initial matter, it was always the parties' mutual intent that Greenbaum be personally liable for the Corporate Defendants' breaches, as anything less than that, that is, the Corporate Defendants' being held liable under the guarantees, would have rendered the guarantees meaningless.

35. Also, it is worth noting many of the Personal Guarantees are not executed in this manner and do not include Greenbaum's corporate title written beneath his signature.

36. Nevertheless, even with respect to those Personal Guarantees that do have Greenbaum's corporate title written beneath his signature, this defense, if accepted, would defeat the intentions of the parties and the entire purpose of a _personal_ guarantee.

### OTM Did Not Violate New York State Insurance Laws

37. I am further advised that Defendants allege that OTM violated New York State Insurance laws by improperly acting as a broker without a license, forcing Defendants' to choose a particular insurance company and collecting fees.

38. These allegations are all without merit and should be dismissed.

7

39. At the outset, it is important to note that as described above, OTM did not sell or broker vehicle property damage or liability insurance to the Defendants. Rather, pursuant to a license agreement, OTM permitted certain of its customers, including the Corporate Defendants, to obtain coverage at favorable rates under OTM's master insurance policy.

40. Further, OTM did not sell trucks to Trucknology or Bronx Truck, it leased them, and did not finance any purchase or lend any money or service any mortgage for the purposes of New York State Insurance Law section 2502.

41. Importantly, OTM did not compel Defendants to choose a particular insurance company. Instead, again, OTM retained its own duly licensed broker in New York State to purchase its own master insurance policy with favorable insurance rates based on the volume of business it conducts nationwide.

42. OTM then offered each of its customers, such as Trucknology and Bronx Truck, the option to participate therein as a licensee. At all times, Trucknology and Bronx Truck were free to purchase their own insurance policies so long as such policies were adequate and appropriate.

43. OTM is not an authorized agent of, nor did it solicit or negotiate any insurance policies on behalf of, any insurer.

44. Further, OTM did not receive any compensation or commission for allowing its customers to participate in the insurance coverage. OTM simply collected reimbursements for the premiums it paid on behalf of the lessees, along with a nominal monthly amount to offset OTM's administrative expenses.

45. Likewise, OTM has not acted as a broker and has not solicited, negotiated or sold any reinsurance contract or binder.

46. OTM has also not investigated and/or adjusted any insurance claims on behalf of an insurer nor has it negotiated or effected a settlement of any claims on behalf of any insured.

47. Similarly, OTM did not negotiate or offer to negotiate any life settlement contract.

### Defendants Are Not Entitled to Any Off-Set

48. I am also advised that Defendants allege their entitlement to an off-set in the amount of $500,000 due to OTM's failure to satisfy Defendants' property damage insurance claims.

49. As a clarification, the insurance policy discussed above only relates to coverage for liability and third party property damage claims.

50. With respect to property damage to the Trucks, OTM was self-insured and only began withholding payments on property damage insurance claims to the trucks in response to Defendants' repeated and material breaches of the Lease Agreements.

51. In any event, there is no evidence showing that the off-set sought by Defendants even remotely approaches $500,000.

### Trucknology's Claims Have no Merit and Should be Dismissed

52. I am further advised by counsel that Trucknology asserts four causes of action against OTM for fraud, breach of contract, unjust enrichment and quantum meruit in relation to a start-up "One-Way" program implemented by OTM (the "Program").

53. The Program ran for about 18 months and was designed to allow third party consumers to rent a truck from a vendor in one location and return it to a different vendor in a different location.

54. As set forth more fully in the Kirk Affidavit, Trucknology did not incur any significant damages with respect to its brief participation in the Program. Quite the contrary, as

set forth more fully therein, upon information and belief, Greenbaum and Trucknology took advantage of, and ultimately benefited from, the Program.

55. Furthermore, Trucknology's claim for $2.5 million in damages is patently absurd and shows the lack of seriousness with which Trucknology has proceeded before this Court. In summary, there is simply no way that Trucknology could have been damaged in the amount of $2.5 million for its limited involvement, consisting of its leasing 10 trucks and working with OTM to store or distribute the balance of the approximately 72 other trucks, in the Program.

## Conclusion

56. Based on all of the foregoing, as well as the arguments and information contained in the accompanying affidavit of Rosemary Halligan and the memorandum of law, OTM respectfully requests that the Court grant the relief requested herein.

_____
SUSAN NASH

[31239]

The State of Texas

County of Kendall

Before me, a Notary Public, on this day personally appeared Susan Nash, President & Chief Executive Officer of On The Move, Inc., known to me (or proved to me on the oath of _____) to be the person whose name is subscribed to the forgoing instrument and acknowledged to me that he executed the same for the purpose and consideration therein expressed.

Given under my hand and seal of office this 28 day of July, A.D. ~~2010~~ 2013

*Terri M. Smith*
Notary Public, State of Texas

(PERSONALIZED SEAL)

Terri M Smith
(Print name of Notary Public here)

My commission expires the 10 day of November ~~2010~~ 2013